1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2
                     CASE NO. 15-60029-CR-ZLOCH
3
UNITED STATES OF AMERICA,
4                                    Fort Lauderdale, Florida
               Plaintiff(s),
5                                    August 19, 2015
          vs.
6
ANDREW BEUSCHEL,
7
               Defendant(s).
8  -----------------------------------------------------------

9                      SENTENCING HEARING
             BEFORE THE HONORABLE WILLIAM J. ZLOCH
10                 UNITED STATES DISTRICT JUDGE

11 APPEARANCES:

12 FOR THE PLAINTIFF(S):  Marc Osborne, Esquire
                          United States Attorney's Office
13                        500 South Australian Avenue
                          Suite 400
14                        West Palm Beach, Florida 33401

15                        Christopher B. Browne, Esquire
                          United States Attorney's Office
16                        99 North East Fourth Street
                          Miami, Florida 33132

17

18 FOR THE DEFENDANT(S):  Thomas Ambrosio, Esquire
                          750 Valley Brook Avenue
19                        Lyndhurst, New Jersey 07071

20

21 REPORTED BY:           Tammy Nestor, RMR, CRR
                          Official Court Reporter
22                        299 East Broward Boulevard
                          Fort Lauderdale, Florida 33301
23                        tammy_nestor@flsd.uscourts.gov

24

25

```
 1   Thereupon,
 2   the following proceedings began at 10:36 a.m.:
 3            THE COURT:  Good morning.  Please be seated.
 4            Calling case No. 15-60029-Criminal.  Counsel, would
 5   you note your appearances for the record.
 6            MR. OSBORNE:  Good morning, Your Honor.  Marc Osborne
 7   on behalf of the United States here withal Special Agent Max
 8   Trimm.
 9            THE COURT:  Good morning.
10            MR. AMBROSIO:  Good morning, Your Honor.  Thomas
11   Ambrosio on behalf of Andrew Beuschel who is sitting to my
12   left.
13            THE COURT:  Good morning, Counsel.
14            Let the record reflect that Andrew Beuschel is present
15   and in the courtroom.
16            Can I have the representative from the probation
17   office note her appearance.
18            THE PROBATION OFFICER:  Good morning, Your Honor.
19   Rebecca Hill on behalf of the U.S. Probation Office.
20            THE COURT:  Good morning.
21            We are here for sentencing.  Mr. Ambrosio, have you
22   read in its entirety the presentence report -- excuse me, the
23   revised presentence report and all of the addendum to it?
24            MR. AMBROSIO:  Yes, I have, Your Honor.
25            THE COURT:  Have you discussed those papers fully with
```

```
 1  Mr. Beuschel.
 2          MR. AMBROSIO:  Yes, I have.
 3          THE COURT:  Other than what's been filed in writing
 4  titled defendant's objections to presentence report, are there
 5  any additional objections or any motions from the defense?
 6          MR. AMBROSIO:  No, Your Honor.
 7          THE COURT:  All right.  Mr. Beuschel, have you read in
 8  its entirety the revised presentence report and the addendum to
 9  it?
10          THE DEFENDANT:  Yes, I have.  I have, sir.
11          THE COURT:  Have you discussed those papers fully with
12  Mr. Ambrosio?
13          THE DEFENDANT:  Yes, I have.
14          THE COURT:  Other than what he has filed in writing on
15  your behalf, do you have any additional objections or motions
16  to anything contained in the revised PSR?
17          THE DEFENDANT:  No.
18          THE COURT:  Are there any from the government?
19          MR. OSBORNE:  Just what we filed.
20          THE COURT:  Other than what you have filed?
21          MR. OSBORNE:  No, Your Honor.
22          THE COURT:  All right.  Thank you.
23          Mr. Ambrosio, are you privately retained, sir?
24          MR. AMBROSIO:  Yes, I am, Your Honor.
25          THE COURT:  Thank you.
```

1          Let me just see if I can get one of the objections

2     taken care of and then I will hear from the defense.

3          The government has objected to paragraph No. 46 of the

4     revised PSR, but is your objection to paragraph 46 or to 47?  I

5     am reading your objection as to the fact that the government

6     has no evidence that Mr. Beuschel or any of his coconspirators

7     were involved in the manufacture or importation of the drugs

8     and that would be specifically paragraph 46.

9          MR. OSBORNE:  Your Honor, that objection was to

10    paragraph 46 of the original presence report.  The numbering

11    of the paragraphs was different.  And that objection has been

12    resolved.

13          In other words, I objected to a specific offense

14    characteristics which was in paragraph 46 of docket entry 59,

15    the original presence report.  That particular enhancement

16    has been removed from the revised presence report, so the

17    old paragraph 46 was deleted and the paragraph that used to be

18    47 is now 46.  Everything was renumbered.

19          So my objection in my docket entry 60, my objection to

20    paragraph 46 has been resolved, Your Honor.

21          THE COURT:  Well, I must have a different -- the

22    revised PSR that you are looking at, what does paragraph 46

23    say?

24          MR. OSBORNE:  Because the offense involved a

25    counterfeit drug, the offense level is increased by two levels.

1           THE COURT:  Okay.  And then 47 goes to reckless risk

2      of death or serious bodily injury.

3           MR. OSBORNE:  Correct, Your Honor.  And I do have an

4      objection to paragraph 47.  But in my objections, that was

5      listed as being an objection to paragraph 48 because my

6      objections were filed before the revised PSR.

7           THE COURT:  All right.  That is where the confusion is

8      coming from.

9           MR. OSBORNE:  Yes, Your Honor.

10          THE COURT:  Let me hear the government's objection to

11     paragraph 47 then.

12          MR. OSBORNE:  My objection, Your Honor, is that this

13     specific offense adjustment is applicable in cases involving

14     conscious or restless risk of death or serious bodily injury.

15     I agree with Ms. Hill, I think she has a good point, that when

16     you are marketing counterfeit prescription drugs, you are

17     creating a risk of serious bodily injury to people who are

18     purchasing a product that obviously has not been manufactured

19     under the conditions, the regulated conditions, that had the

20     mark holder, in this case Pfizer, would require.

21          However, in this particular case, Your Honor, there

22     was no risk of death or injury other than what I just said,

23     other than the same risk of death or injury that would apply to

24     any case involving counterfeit drugs.  In other words, there

25     was no toxic substance in the drugs.  There was no substance in

1    there that created a risk of abuse or of addiction or that sort

2    of thing.

3              So if the adjustment were applicable to this case,

4    essentially it would be the same as saying that there should be

5    a four-level adjustment for any case involving counterfeit

6    drugs because there is already an adjustment of two levels for

7    any case involving counterfeit drugs.

8              THE COURT:  All right.  These drugs involved Viagra

9    and Cialis?

10             MR. OSBORNE:  Correct, Your Honor.

11             THE COURT:  And there is no dispute that they were, in

12   fact, Viagra and/or Cialis?

13             MR. OSBORNE:  That they were not authentic, Your

14   Honor.  They contained the active ingredient, the same active

15   ingredient that you would find in Viagra and Cialis, but there

16   is no dispute that there were not, in fact, Viagra and Cialis.

17   They were counterfeit drugs.

18             THE COURT:  All right.  And I reviewed my trial notes,

19   but I do not believe that anyone testified at trial that they

20   posed a serious risk of death or bodily injury to anybody.

21   Correct?

22             MR. OSBORNE:  No, we didn't have any testimony like

23   that, Your Honor, correct.

24             THE COURT:  Does the government agree that what I will

25   simply refer to as the active ingredient in each pill had

1   diminished because of the time that had passed?

2        MR. OSBORNE:  Well, what it was, Your Honor, the

3   active ingredient was at about 50 percent potency which we

4   often see in cases of counterfeit drugs, that the drug is not

5   sufficiently potent.  That actually does create a public health

6   risk because the person taking the drug, the counterfeit drug,

7   may get used to the idea, oh, I need two, I need four in order

8   to get the proper effect.  And then when the person obtains the

9   legitimate drug, they may take too much of it and lead to an

10  overdose, Your Honor.

11        So there are these dangers associated with he

12  counterfeit drugs, but again, I don't feel in this case it's

13  sufficient to warrant the adjustment in the presentence

14  report --

15        THE COURT:  Based on what you just said about someone

16  taking two, three, four, five to get the result that they are

17  looking for or that they are hoping to get --

18        MR. OSBORNE:  Yes, Your Honor.

19        THE COURT:  -- why does that not pose a serious risk

20  of death or bodily injury to the individual who might take

21  those pills?

22        MR. OSBORNE:  It does pose such a risk, Your Honor.  I

23  just think that almost the same risk would be applicable to

24  virtually any case involving prescription drugs.  So on

25  balance, my view is that that adjustment probably should apply

1    to a case where -- for example, if you had a drug like

2    Percocet, for instance.  Now, there is a drug, very commonly

3    could be counterfeited, people take it for -- people take it

4    for recreational purposes.  If they get in the habit of taking

5    too much Percocet, that's actually a quite dangerous drug, it's

6    it addictive, it's something you can overdose on.  Now, there

7    is something I would be here saying to Your Honor that is a

8    case where this is applicable to a case where the active

9    ingredient was at too low of a level.

10         I think Your Honor has a good point.  I think Ms. Hill

11   has a good point.  I'm not saying it's crazy to apply this

12   adjustment to this case.  But on balance in my opinion, this is

13   not the case for that adjustment.

14         THE COURT:  All right.  At least for the purposes of

15   this case, I will accept the government's objection and sustain

16   it.

17         Does that take care of the government's objections?

18         MR. OSBORNE:  I believe so, Your Honor.  There is one

19   very minor point in my --

20         THE COURT:  It has nothing to doing with the guideline

21   computation?

22         MR. OSBORNE:  That's the only thing that will affect

23   the guideline computation, Your Honor, correct.

24         THE COURT:  And the other one, go ahead, is a point of

25   clarification that you have?  Go ahead.

1           MR. OSBORNE:  Well, in my supplemental objection, Your

2    Honor, where I mentioned the increase in the restitution

3    figures, I just wanted to point out -- Ms. Hill is the one that

4    pointed it out to me.  I don't want to take the credit.  -- but

5    that should be -- paragraph 104 was not updated.  The total

6    amount of restitution is correctly stated, Your Honor, in

7    paragraph 40.  And paragraph 104 should also be updated to

8    reflect -- at least -- I mean, I don't mind what's in the

9    presentence report, but the total amount of restitution should

10   be the --

11          THE COURT:  $34,534.40.

12          MR. OSBORNE:  Correct, Your Honor, as stated in

13   paragraph 40.

14          THE COURT:  Madam Probation Officer, make that

15   correction.

16          THE PROBATION OFFICER:  Yes, sir.

17          THE COURT:  So does that take care of the government's

18   objections and clarifications?

19          MR. OSBORNE:  Yes, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Mr. Ambrosio, what objection remains that would affect

22   the guideline computation for the defense?  The other ones are

23   pretty much clarifications which I will allow to be the

24   defendant's position regarding the matters that are set forth

25   in your paragraphs, but which ones affect the guideline

```
 1    computation.  I know that you are asking for a minor role

 2    reduction.

 3              MR. AMBROSIO:  Yes, Judge.

 4              THE COURT:  Are there any other objections that affect

 5    the guideline computations?

 6              MR. AMBROSIO:  Yes, Judge.

 7              THE COURT:  Go ahead.

 8              MR. AMBROSIO:  There is an objection as to the

 9    increase -- there's an objection to the value of the drugs.  My

10    objection is that the drugs --

11              THE COURT:  Are zero?

12              MR. AMBROSIO:  Are zero?

13              THE COURT:  Because they expired?

14              MR. AMBROSIO:  Yes.

15              THE COURT:  Go ahead.

16              MR. AMBROSIO:  And also, Judge, in terms of the

17    relevant conduct, it is also my position that because the

18    numbers -- the total numbers, I think it's an 18 -- it's a

19    14-point increase which is at --

20              THE COURT:  Paragraph No. 45.

21              MR. AMBROSIO:  -- paragraph No. 45.  And that is

22    not -- that 18 -- the 14-point increase, Your Honor, is not

23    just from the 2,724 Viagra tablets that were shipped by

24    Mr. Beuschel on June 17, 2014.  It also includes computations

25    based upon emails that were sent by Mr. Beuschel in 2013 where
```

1   the government's position is Mr. Beuschel was speaking about

2   counterfeit Viagra; therefore, that's relevant conduct and we

3   should include those 10,000 pills.

4        And there was one final one.  There was -- he gave a

5   voluntary statement to the Woodbridge, New Jersey Police

6   Department where he acted as a middleman, and this was

7   testimony at trial as well I believe, where there was a man

8   that wanted to buy some Viagra because he was going to the

9   Dominican Republic.  Mr. Beuschel says, I spoke to

10  Mr. Jackovich who was one of the owners of a warehouse in New

11  Jersey.  He said to Mr. Jackovich, I need to borrow or buy some

12  of your Viagra.  He met with this third person.  He gave him

13  the Viagra.  He met with him the next day, and he said, yeah,

14  I'll take it.  What he told the police was, well, he wanted to

15  make sure it was the real stuff because you can get this stuff

16  from Canada and they send you phony stuff.

17       But the government's position is those tablets as well

18  should be considered relevant conduct because Mr. Beuschel

19  knowingly helped transfer or traffic in counterfeit Viagra

20  and/or Cialis.  And my position is that by the preponderance of

21  the evidence standard that the Court has to utilize, that they

22  can't prove that without any kind of corroboration from a

23  co-conspirator or unindicted co-conspirator.  All they have is

24  Mr. Beuschel's statement.

25       And I point out in my brief, Your Honor, that the

1   police didn't even though that the Viagra that was seized from

2   the warehouse in New Jersey was counterfeit.  It wasn't

3   determined until after the actual trial here.  And I would

4   suggest, Your Honor, that Mr. Beuschel's voluntary statement

5   where he says, look, this guy that I was bringing them to, he

6   wanted to check them out, that suggests, and I think by a

7   preponderance of the evidence, that Mr. Beuschel wasn't making

8   any representations.  He was just acting as a middleman and he

9   was saying, look, here, you check them out.  If you don't want

10  them, if you think these are counterfeit, don't buy them

11  because I'm just helping you out.

12          And I think that that should carry an extreme amount

13  of weight, and that for those reasons, the pills related to the

14  2012 transaction in Woodbridge, New Jersey shouldn't be

15  counted.

16          And as to the email, there was an email from 2013.

17  There was one in January and one in February.  And in those

18  emails, Mr. Beuschel is talking to Mr.Fiore saying, look, I

19  have this stuff that was made for me.  It's $2 a case (sic).  I

20  have oranges and blues.  And the government's position is, Your

21  Honor, that was counterfeit Viagra.  And I would remind Your

22  Honor that one of the things that we submitted into evidence

23  were emails from Mr. Beuschel to various people where he talks

24  about a product called Clavine that he was producing.  And the

25  Clavine -- and one of the other things that was introduced were

1   the pamphlets.  And to summarize it, Clavine is an herbal

2   version of --

3            THE COURT:  I remember, but go ahead.

4            MR. AMBROSIO:  -- of Viagra.  So given those emails

5   and without any other testimony from Mr. Fiore or another

6   person and without any indication that there was shipments of

7   these 10,000 cases, I don't think that the government meets the

8   burden of proof of by a preponderance of the evidence to

9   establish that in those emails from 2013, that Mr. Beuschel was

10  talking about counterfeit Viagra and/or counterfeit Cialis.

11           And I would note, Your Honor, that the government had

12  approximately 20 gigabytes of emails from Mr. Beuschel's AOL

13  business account.  And those were the only two emails that they

14  presented at trial.  And I would submit, Your Honor, that you

15  have to look at this in the context of Mr. Beuschel's life and

16  his business.

17           I don't think anybody is going to dispute that

18  Mr. Beuschel is a businessman and he is in the business of

19  dealing with different products.  And that's why, Your Honor, I

20  did submit letters for you to review from various people in

21  Mr. Beuschel's business life, some going back almost 30 years,

22  Your Honor.

23           I would submit that Your Honor can use a lot of

24  deference to those emails and to that context.  I think it

25  pushes over to the 51 percent level which the preponderance

1   standard is.  And I believe that in context with the emails and

2   with the lack of any other statements and with the lack of any

3   other corroborating evidence, that Mr. Beuschel has bumped up

4   to that 51 percent preponderance standard.  And I think for

5   those reasons, that the 14-point enhancement should not be

6   given.

7           And, Your Honor, there's a third prong to that.  The

8   third prong has to do with the drugs themselves.  And very

9   short, Judge, because you were in the trial, there was

10  testimony that the drugs were expired and they were expired

11  before that first email that was sent by Mr. Beuschel to Frank

12  Fiore.  That email was May 7, 2014.  The drugs were actually

13  shipped on July 17, 2014.  There are federal regulations that

14  require drug manufacturers to destroy any expired drugs.  And

15  there was -- I don't think there's any contest to that fact.

16          So for those drugs, it's clear that they had a value

17  of nothing.  And I know the government's position is it should

18  be the intended loss and in their arguments, they indicated

19  that it was very hard to see the expiration date on the packets

20  of the Viagra because, if you pulled it out, there was also a

21  second, there was also a second expiration date.

22          Judge, I would submit that that actually helps

23  Mr. Beuschel's argument that they were expired and he shouldn't

24  have known that.  On the one hand, the government says, look,

25  he knew the stuff was expired -- he knew the stuff was

```
 1    counterfeit because he spent a great deal of time looking at

 2    the package and there were very minor typos and prints that the

 3    expert from Pfizer said, look, we can tell this is counterfeit

 4    because of the packaging, because of the letters.

 5            I would submit that if you want to say that

 6    Mr. Beuschel knew they were counterfeit because he examined

 7    them, then clearly he would have examined the fact that there

 8    was an expiration date on the blister pack.

 9            So for those reasons, Judge, that third set of drugs I

10    submit has a value of zero.  And if Your Honor accepts my

11    position on that, my arguments, then I would submit that the

12    proper enhancement would be one.  Because if it's zero to 5000,

13    there is a one point increase.

14            And again, Judge, I want to remind Your Honor, this

15    case is not about illegal drugs.  This is an intellectual

16    property case.

17            THE COURT:  I understand.

18            What does the government say?

19            MR. OSBORNE:  First, Your Honor, the case certainly is

20    about counterfeit drugs.  The statute prohibits trafficking in

21    counterfeit drugs.  That's the words in the statute.  The

22    evidence by a preponderance of the evidence certainly does

23    indicate, Your Honor, that the defendant knowingly trafficked

24    in counterfeit drugs both in December or November and

25    December 2012 and in January and February 2013.  And it also
```

```
 1    establishes that the infringement value of the drugs that the
 2    defendant trafficked in in 2014 is as stated in the presentence
 3    report and not zero.  So I will take the arguments sort of one
 4    at a time.
 5            As I understand the argument that Mr. Ambrosio has
 6    just made here in court regarding the drugs that Mr. Beuschel
 7    trafficked in November and December, I guess he was saying that
 8    the evidence didn't establish that Mr. Beuschel knew that those
 9    drugs were counterfeit.
10            THE COURT:  Excuse me for just a minute.
11            Go ahead, Counsel.
12            MR. OSBORNE:  Thank you, Your Honor.  So I understood
13    the argument he made regarding the first set of drugs, Your
14    Honor, the ones from November 2012, that his argument was that
15    the evidence does not establish by a preponderance of the
16    evidence that Mr. Beuschel knew that the drugs in question were
17    counterfeit.
18            But I don't think that's true, Your Honor.  I think
19    the preponderance of the evidence is that Mr. Beuschel did know
20    that the drugs were counterfeit.
21            And the reasons that I say that, first of all, he told
22    the Woodbridge police specifically that he knew about the
23    importance when you are selling the drugs that people are only
24    going to buy them if they are real and that he showed them to
25    the customer for that.
```

1      Now, I think that obviously he at least knows that

2 shows that there is an issue with counterfeit drugs and that

3 the drugs have to at least look real enough that people are

4 going to want to buy them.

5      He's also buying the drugs, Your Honor, for $2 per

6 tablet whereas, in fact, their wholesale value at the time of

7 that transaction, Your Honor, was a little over $20 for the

8 Viagra and about $24 for the Cialis.

9      And as Mr. Ambrosio himself noted, Mr. Beuschel is an

10 experienced businessman and it's hard to believe he wouldn't be

11 aware that he was buying the drugs an order of magnitude

12 cheaper than even their regular wholesale price.

13      He also refers to the drugs in coded language, Your

14 Honor.  He talks about the blue and orange candy in his text

15 messages to Mr. Jackovich.  Mr. Ambrosio's correct, Your Honor,

16 he did introduce emails in which the defendant discussed his

17 own, I guess you could call it a competing product, a nondrug

18 product, designed to deal with erectile dysfunction.  But in

19 those emails, he refers to that product by name as Clavine.

20 And the reason he does that, Your Honor, is that it's not a

21 counterfeit product, it's not an illegal product, and he has no

22 reason to use this same coded language.

23      He's also using that same language talking about blues

24 and oranges and candy and Skittles when he's dealing with the

25 cooperating source, Your Honor, in 2014.  And there the jury

1    concluded beyond a reasonable doubt that the defendant did know

2    that the drugs were counterfeit.

3          THE COURT:  Well, they would have to make that

4    finding.

5          MR. OSBORNE:  Well, I am saying for the drugs that

6    were sold to the cooperating source, Your Honor instructed the

7    jury they could convict him only if he knew that the drugs were

8    counterfeit.

9          THE COURT:  Right, that's a finding -- that was an

10   element that the jury had to find.

11         MR. OSBORNE:  Yes, Your Honor.  That's what I meant.

12         THE COURT:  Correct.

13         MR. OSBORNE:  So I am saying that he's using the

14   consistent coded language, the same coded language in

15   November 2012, Your Honor, that he later used a year and a half

16   later with the cooperating source at a time that he did know

17   that those drugs were counterfeit, Your Honor.

18         And he also used the same coded language in January

19   and February 2013 again talking about candy and Skittles.  And

20   at that time he said the drugs had been made for him.  So he

21   certainly knew that he was not dealing with authentic drugs at

22   that time.

23         So I think -- I also think Your Honor should consider

24   it's true that he gave an interview to the Woodbridge Police

25   Department, but, in fact, the statements he made to the

1    Woodbridge Police Department did not -- he was not fully

2    forthcoming with them.  For instance, he denied that he had

3    resold the drugs in question.  He claimed that he bought the

4    drugs from Mr. Jackovich but then gave them away to his friend.

5    But, in fact, his text message to Mr. Jackovich says that he

6    sold 140 blue and 140 orange four packs.

7           So overall, Your Honor, I think the evidence by a

8    preponderance of the evidence establishes that Mr.  Beuschel

9    did know in November 2012 that he was buying and selling,

10   trafficking in, counterfeit prescription drugs.

11          Turning to the emails of January and February of 2013,

12   Your Honor, now, the first -- the argument I think Mr. Ambrosio

13   made is different.  I didn't understand him to argue that

14   Mr. Beuschel didn't know the drugs were counterfeit because he

15   says to Mr.  Fiore, they were made for me.  What I understood

16   him to argue is those emails could have been about Clavine

17   rather than Viagra and Cialis.

18          Let me also point out, Your Honor, Mr. Ambrosio said

19   several times there's no corroborating evidence.  And with

20   regard to that November 2012 transaction, that's obviously not

21   true because the Woodbridge Police Department did a search of

22   Mr. Jackovich's facility and actually found counterfeit Viagra

23   and Cialis there.  Although Mr. Ambrosio is correct that the

24   drugs were weren't tested to determine if they were counterfeit

25   at that time.  But there certainly is corroborating evidence

1    about that incident.

2            Now, with regard to the January and February, Your

3    Honor, here I think Mr. Ambrosio --

4            THE COURT:  January, February of two thousand --

5            MR. OSBORNE:  '13, Your Honor, right.  So about two

6    months after Mr. Beuschel bought the drugs from Mr. Jackovich

7    and sold them to somebody -- I want to emphasize most of what

8    Mr. Ambrosio said is just Mr. Beuschel's story, the friend

9    going to the Dominican Republic, that sort of stuff, that's

10   just what he told the police.  What we know from his text

11   messages is that he bought these drugs from Mr. Jackovich and

12   he told Mr. Jackovich, I sold them and I will bring the candy

13   payment on Monday.

14           Now, two months later, he emails Mr.Fiore and he says

15   blue and orange Skittles candy, do you want them.  He's using

16   the same language, the blue and orange candy, the cost is the

17   same, $2 per.  He calls it $2 per case, but it's the same --

18   it's certainly the same figure in any event.  And the -- he

19   later calls them Skittles.  He says he's being be driven crazy

20   by his wife and they need to go.  He's offering Mr. Fiore the

21   exact same deal as he just did two months before.

22           Now, the possibility that what he's trying to sell

23   Mr. Fiore is Clavine, Your Honor, which is what Mr. Ambrosio

24   suggested, that doesn't make any sense.  First of all, Clavine,

25   as I pointed out, Mr. Ambrosio's own evidence at trial, the

 1    defendant talks about Clavine by name.  He doesn't call it

 2    skittles.

 3          THE COURT:  The defense does not hide it.

 4          MR. OSBORNE:  Exactly.  And specifically, the blue and

 5    orange Skittles candy language, Viagra pills are blue, Cialis

 6    pills are orange.  That's the same exact language that he used

 7    November 28, 2012 and the same language, the blue and the

 8    orange, that he used when he met with the cooperating source in

 9    person.

10          So the fact that he's using that language, Your Honor,

11    the blue and orange Skittles candy makes it clear that what he

12    is selling is the same exact product he just was selling two

13    months earlier, namely the same counterfeit drugs which he says

14    they were made for me so he knows they are counterfeit.

15          And the definition of trafficking, Your Honor,

16    Mr. Ambrosio pointed out, there is no -- we don't know, we

17    can't tell, were they actually shipped to Mr. Fiore or not,

18    that is true.  But the statutory definition of trafficking kind

19    of combines what you see in controlled substance cases.  It

20    says it is either the distribution of the drugs or the

21    possession with the intent.

22          So he is trafficking in these drugs in January and

23    February of 2013.  And both of those incidents, I believe, are

24    properly included in his relevant conduct.

25          The last issue, Your Honor, which is really more of an

1  interpretation of the guidelines, it's not a factual dispute,

2  is what is the infringement value specifically of the drugs

3  that were sold to the cooperating source which is the incident

4  charged in the indictment.

5         THE COURT:  Let me do this before you address that

6  point.

7         MR. OSBORNE:  Yes, Your Honor.

8         THE COURT:  With respect to the defendant's knowledge

9  of the counterfeit drugs, that objection by the defense, I am

10  going to overrule the defendant's objection.  The Court finds

11  by a preponderance of the testimony and evidence presented at

12  trial and the statements of the prosecutor in the government's

13  written submissions dealing with the objections which the Court

14  adopts, the Court finds by a preponderance of the evidence that

15  Mr. Beuschel knew that he was dealing in counterfeit drugs

16  during the time periods that have been raised in the

17  objections.

18         Go ahead, Counsel.

19         MR. OSBORNE:  Thank you, Your Honor.

20         So I will address now then the last argument

21  Mr. Ambrosio made.

22         THE COURT:  The value.

23         MR. OSBORNE:  Which was the, right, Your Honor, the

24  infringement value.  Now, what the guideline says, Your

25  Honor -- it's always good to start with the actual language, I

1    think.

2         What the guideline says is that the infringement value

3    for purposes of sentencing is the value of -- is the value of

4    the good that was infringed.  Let me just flip to the

5    guideline, Your Honor, if -- okay.  So it's the value of the

6    infringed item.

7         THE COURT:  Just give that section for the record.

8         MR. OSBORNE:  Yes, Your Honor.  I am looking at

9    section 2B5.3, application note 2A where it says, to use the

10   retail value of the infringed item multiplied by the number of

11   infringing items if, it says, the infringing item is or appears

12   to be or appears to a reasonably informed purchaser to be

13   identical or substantially equivalent to the infringed item.

14        So the issue is, well, what is the infringed item

15   here.  And essentially, Mr. Ambrosio's argument appears to be

16   that the infringed item is expired Viagra.  Once Viagra has

17   expired, it has no retail value, which I agree with, and

18   therefore, the infringement amount is zero.

19        THE COURT:  Correct.  That's the defense's position.

20        MR. OSBORNE:  Right.  And what I say, Your Honor, is

21   that does not make sense as an interpretation of this language.

22   The infringed item is the item that the defendant is trying to

23   mimic, that he wants his counterfeit product to look like

24   something, whatever he's trying to make it look like, that's

25   the infringed item.  So the infringed item in this case is

1   legitimate salable Viagra.  And we know that, Your Honor,

2   because when the cooperating source complained to Mr. Beuschel,

3   oh, you know, wait a minute, these are all -- the expiration

4   dates has passed.  He emailed him.  Mr. Beuschel did not

5   respond by saying, of course they are, that's why they are so

6   cheap, don't you know the retail value is zero.  He responded

7   by saying, just take them out of the box, nobody will ever

8   know.

9          So he's trying to sell a product that infringes on

10  counterfeit Viagra that had not yet expired, counterfeit Viagra

11  that has its value.

12         THE COURT:  Because if he leaves them in the box, the

13  box has the expiration date.

14         MR. OSBORNE:  That's what he meant by that, exactly,

15  Your Honor.  He put in his email --

16         THE COURT:  Take them out of the box.

17         MR. OSBORNE:  Right.  Now, we actually brought with

18  us, Your Honor, so that you can look at them if you choose, one

19  of the exhibits that we introduced at trial.  It's Exhibit

20  No. 20 which is some of those boxes.  You can see that the

21  infringement -- the expiration date is very hard to see, but it

22  is actually on the blister pack.

23         THE COURT:  I remember that from the trial.

24         MR. OSBORNE:  Okay.  So Mr. Beuschel was incorrect

25  about that, Your Honor.  But the point is he's attempting to

1    infringe on Viagra that still has its retail value.  And so the
2    question is whether the product that he was selling was
3    substantially equivalent or appeared to a reasonably informed
4    purchaser to be substantially  equivalent to that Viagra, the
5    Viagra that you can still sell because it hasn't yet expired.
6         The answer to that question, Your Honor, is yes, it
7    does look substantially equivalent.  It's not quite identical.
8    There are certain differences.  Some of them the color was a
9    little wrong, the size of the tablets a little wrong, the font
10   used for the word Pfizer just a little off.
11        Another difference, Your Honor, another subtle
12   difference between the infringing counterfeit item and the real
13   item is that they got the expiration date wrong.  They put too
14   early of an expiration date on the drugs.  Of course, these
15   drugs are not either in expired or unexpired.  They are not
16   real Viagra at all.  It's just when they are creating the fake
17   product, when they are making the fake packaging, they didn't
18   do a great job.
19        And you heard testimony at trial, the package looks
20   pretty good, but it's not quite the way a real box of Viagra
21   looks.  One problem is the expiration date which is hard to
22   see.  It's subtle.  To a reasonably informed observer, you
23   could still think you are buying real unexpired Viagra.  And,
24   therefore, the infringement value is the value of the thing
25   that he's trying to pass these goods off as.  And what he's

```
 1    trying to pass the goods off as, as he says, himself, to the

 2    cooperating source, is unexpired Viagra.  And he says, take it

 3    out of the box.  That way people won't know that it has the

 4    wrong expiration date on it.

 5          So if Mr. Ambrosio's interpretation of the guideline

 6    was correct, Your Honor, I just think it would essentially --

 7    it would render -- it wouldn't make sense given the purpose of

 8    the guideline.  In other words, the purpose of the guideline is

 9    to penalize a person who is selling a product that looks very

10    similar to the real product.

11          These look very similar to the real product.  A person

12    could easily buy those and miss the subtle, hard to see

13    expiration date which is just sort of embossed on the box.

14    It's not at all easy to see.  Therefore, because he's selling a

15    product that can easily be mistaken for legitimate Viagra, then

16    the value that should be considered for purposes of sentencing

17    is the value of the Viagra that he was copying.

18          THE COURT:  That objection by the defense is directed

19    specifically towards paragraph No. 45 of the revised

20    presentence report.  And the Court will overrule or deny the

21    defendant's objection.  The Court finds that the infringement

22    amount exceeded $5,000 and that the 14-level increase is

23    appropriate.  The Court makes that finding based on the

24    testimony and evidence presented at trial and adopts the

25    statements of the probation officer and of the government in
```

```
 1   its written submission as additional reasons for the Court's
 2   ruling.
 3          Just so the record is clear, the Court makes that
 4   finding by a preponderance of the evidence.
 5          Mr. Ambrosio, I believe the two remaining objections
 6   that would affect the guideline computation from the defense
 7   are the defense wants acceptance of responsibility and wants a
 8   minor role reduction, is that correct?
 9          MR. AMBROSIO:  Yes, Your Honor.
10          THE COURT:  Go ahead and argue those two.
11          MR. AMBROSIO:  Judge, on the acceptance of
12   responsibility, Your Honor, our position, my client's position
13   is that he fully and freely admits to committing this offense.
14          THE COURT:  But when did he do that?
15          MR. AMBROSIO:  Judge, he admits it now.  He also
16   admitted the overwhelming majority of the offense when he went
17   and spoke to the government.  He went down with myself, Your
18   Honor.  We went to the U.S. Attorney's Office knowing that what
19   he said to them would be inculpating him in a crime.  He wasn't
20   asked whether it was counterfeit.  He didn't say it was
21   counterfeit.
22          But he did admit back in 2014, I believe it was
23   September, at the U.S. Attorney's Office that he had shipped
24   what he -- he said it was Viagra.  And he got it from Frank
25   Fiore.
```

1          And by saying that, Judge, that was an admission of

2     committing a crime, not the crime he's committed here, but he

3     accepts the jury's determination that the government proved

4     beyond a reasonable doubt that he knew that the Viagra was

5     counterfeit as opposed to authentic.  But I would submit, Your

6     Honor, that there is enough factual scenario here for Your

7     Honor to use the Court's discretion and confer two points of

8     acceptance of responsibility in this particular case.  And I

9     think that --

10          THE COURT:  Are you saying that when he met with the

11     government, that he confessed, or that he admitted his

12     involvement in the charges in this indictment?

13          MR. AMBROSIO:  Not the charges in this indictment,

14     almost all of the elements in this indictment, Judge.  He

15     admitted to shipping Viagra which in and of itself is a crime.

16     The only additional element that he didn't admit was that it

17     was counterfeit Viagra that he had shipped.  And to Mr.  -- he

18     wasn't asked that question.

19          Your Honor, I don't think that he should be punished

20     for exercising his constitutional right to have a trial.  But I

21     do believe that he could stand here today and he will speak to

22     Your Honor and he will accept responsibility for his actions

23     and for the jury's determination that he was guilty.

24          And, you know, Judge, many times I have had clients

25     that don't admit anything ever and they would only go to speak

```
 1   to the U.S. Attorney's Office if, in fact, there was some kind
 2   of proffer agreement.  Mr. Beuschel went down there fully aware
 3   that by going down there, he was inculpating himself in some
 4   type of crime.  I suggest that the only thing that he didn't do
 5   was the counterfeit version, and that's one element.
 6            Your Honor, I am suggesting that Your Honor can use
 7   your discretion and confer acceptance of responsibility in this
 8   case.
 9            THE COURT:  What does the government say about the
10   acceptance of responsibility issue?
11            MR. OSBORNE:  Well, Your Honor, Mr. Beuschel, I guess
12   he accepted responsibility for the wrong crime, Your Honor.
13   Interstate shipment, interstate wholesale distribution of
14   prescription drugs without a license, that is a crime.  The
15   guidelines are pretty low for that unless the government can
16   show an intent to defraud.
17            So in this case, what we did was charge what the
18   defendant actually did, which is traffic in counterfeit drugs.
19   That crime, I think the first time he's ever accepted
20   responsibility for it, apparently via his lawyer, he's done it
21   right here in court, but that's the first time Your Honor.
22            In fact, what Mr. Beuschel did when he came and spoke
23   to Mr. Trimm and me is to present a self-serving version of
24   events, Your Honor, that minimized his culpability.  He had
25   this story that, as I argued to the jury at trial, as I am sure
```

1   Your Honor, remembers wasn't true.  What he said was Mr. Fiore

2   shipped him these drugs, that he didn't even know they were in

3   the box.  Mr. Fiore then told then, well, I shipped you some

4   product by accident.  Could you send it back to the cooperating

5   source.  He looks in the box and sees it's Viagra, but that's

6   it.  He has no other role, he claimed, in the transaction

7   except just to get it to the cooperating source.  And he

8   insisted it was Mr. Fiore's deal.

9          And everything he did he said was at Mr. Fiore's

10  direction.  He said, take them out of the box because of the

11  expiration date, that's what Mr. Fiore told him.  When the

12  cooperating source complained, I don't want to pay because of

13  the expiration date, he found a buyer that the cooperating

14  source could ship them to and he claimed to us that was

15  Mr. Fiore who found that buyer.

16         Now, as I pointed out to the jury, most of that is not

17  true, Your Honor.  It's demonstrably not true.  This wasn't a

18  deal Mr. Fiore set up and in which Mr. Beuschel was sort of an

19  unwitting middleman.  And you know that because the deal -- the

20  first involvement Mr. Beuschel had in the deal, really the

21  first time that we know of that anybody talked about the 2014

22  deal is when Mr. Beuschel emailed Mr. Fiore and said to him, I

23  can sell you candy, Skittles, and if you need more, I'm sure we

24  can accommodate your request.

25         So it's Mr. Beuschel, as I argued to the jury, that is

1     the one that is selling the drugs.  This whole story that it's

2     Mr. Fiore's drugs and Mr. Fiore's deal is not true.  And

3     Mr. Beuschel actually got caught up, Your Honor.  He must have

4     forgotten the story he told us.  Because when he was arrested,

5     he told a different story, a little bit different, but

6     tellingly so.

7          He told us that it was Mr. Fiore who found Mr. Veltre

8     to be the buyer for the drugs when the cooperating source

9     refused to pay.  But when he was arrested, he actually said

10    that he, Mr. Beuschel, had found Mr. Veltre.  And his story now

11    became he met Mr. Veltre and Mr. Jacovich's business, that

12    Mr. Veltre wanted to buy these 6,000 tablets of Viagra for

13    personal use, and so Mr. Beuschel just put Mr. Veltre in touch

14    with the cooperating source, so a different story.

15         The reason I says these things is that's not

16    acceptance of responsibility, Your Honor.  Mr. Beuschel made a

17    calculated effort to evade responsibility for his actions by

18    minimizing his role in the offense.  And he certainly did not

19    admit that he had knowingly trafficked in counterfeit drugs.

20    And the proof of that is he went to trial and he denied it at

21    trial.

22         So if you were intending to come down and accept

23    responsibility for what you did, then presumably when the trial

24    came around, you would say, apparently there's been a big

25    misunderstanding because I have already accepted responsibility

1    for this and there's nothing for the jury to do.

2          So he's not being penalized for exercising his right

3    to trial, Your Honor, but the guidelines, as has certainly been

4    upheld as constitutional, do call for a heavier sentence as has

5    been done, I think, since time in memorial in the judicial

6    system, for a person who does not accept responsibility for his

7    own actions and Mr. Beuschel except maybe today through his

8    lawyer's mouth may be the first time that Mr. Beuschel has

9    accepted any responsibility.

10         THE COURT:  All right.  The Court will overrule

11   Mr. Beuschel's objection to not receiving any reduction for

12   acceptance of responsibility.  The Court finds by a

13   preponderance of the evidence that Mr. Beuschel has not fully

14   accepted responsibility for his actions that bring us here

15   today and, therefore, he's not entitled to any reduction.

16         And then the final request from the defense is for a

17   minor role reduction.  Mr. Ambrosio?

18         MR. AMBROSIO:  Judge, my request on the minor role is

19   based upon the totality of the circumstances in this case.  And

20   I would suggest that Mr. Beuschel's conduct in this case was an

21   aberration.  At the time he was 51 years old.  He's been an

22   established businessman.  The people involved in -- it's the

23   average participant that the Court is supposed to look at in

24   terms of whether or not there is a minor role.  And I would

25   suggest that there is a stark contrast between the conduct of

```
 1   Frank Fiore who is the co-conspirator in this case and
 2   Mr. Beuschel.  Your Honor got to hear the videotape or see the
 3   videotape of Mr. Fiore conducting business and Your Honor got
 4   to hear the contrast of the business meeting that Andrew
 5   Beuschel had with the confidential source in this case.  And I
 6   submit, Your Honor, that there is a huge difference and there
 7   are two very widely separated people.
 8          I would also suggest, Your Honor, that one of the
 9   things that will help establish the fact that this is an
10   aberration is that during Mr. Beuschel's conversation with the
11   confidential source, the confidential source said to him
12   something to the effect of I thought you were going to bring
13   the stuff down when you met me here today.  And Mr. Beuschel
14   said, well, I didn't want to bring it on the plane.
15          And there was a discourse, and I the put it in my
16   memo, Judge, about how Mr. Beuschel clearly had never shipped
17   Viagra before because he didn't even know how to do it.  He was
18   worried about drugs -- dog sniffing drugs.  And Mr. Bryant
19   said, no, you don't need dog sniffing drugs.  You don't need to
20   pack it in coffee and he started laughing.
21          And at the end of that small colloquy, Mr. Beuschel
22   said, okay, when I get back, I will put it in UPS and I'll ship
23   it to you.  And he shipped it under Frank Fiore's named because
24   he was trying to distance himself from this whole thing.  I
25   would submit, Your Honor, that it isn't a fantasy that
```

1    Mr. Beuschel was owed $130,000 in a legitimate business deal.

2    That 130,000 debt was -- it was acknowledged by Tony Bryant in

3    their meetings.  Yeah, you know, I am going to get you paid

4    back.  And he talked about the fact that it was Frank Fiore

5    that was involved.

6          Mr. Beuschel spent $160,000 initially on what he and

7    his partner believed was a legitimate business deal, and

8    unfortunately Mr. Beuschel got caught up with some bad people.

9          And I would submit that if you contrast the background

10   of Frank Fiore and my client and you contrast the fact that

11   Frank Fiore in his -- in video, he talks about counterfeit

12   Xanax, he talks about drugs, he talks about killing

13   Mr. Beuschel.  He even said take -- he didn't know he was

14   speaking to an undercover agent, but he suggested to the agent

15   that he should take an AK47 and put it into Mr. Beuschel.

16         And my position, Judge, is that when you contrast that

17   to the conduct of Mr. Beuschel, who was only trying to get back

18   some money that was owed to him, he didn't say here's $50,000

19   worth of Viagra.  He was getting less than $7,000 back on a

20   debt that he was trying to collect.  But for that debt, Your

21   Honor, Mr. Beuschel wouldn't even be here today.

22         For those reasons, I think that Your Honor can afford

23   him a two-point reduction for a minor role.

24         THE COURT:  But are you saying that the minor role is

25   based on the fact that he was just a minor participant or are

1   you arguing aberrant behavior?

2          MR. AMBROSIO:  I'm arguing both, Judge.  I believe

3   that it's aberrant behavior.  But that's more of a variance

4   argument, Judge.  So my position is it's more of a minor

5   participant.  This was a one-time shipment.  There was no

6   follow-up by the government.  There was no indication that

7   Mr. Beuschel had the ability to follow up.  And you can't look

8   at it only from Mr. Beuschel's standpoint.  You have to compare

9   it to Mr.  Fiore and other like defendants.

10          THE COURT:  All right.  Thank you.

11          What does the government say?

12          MR. OSBORNE:  Well, Your Honor, I think my argument

13   specifically to this objection is really what Your Honor has

14   probably already just commented on, that the mitigating role

15   adjustment is applicable to a person who plays a part in

16   committing the offense that makes him substantially less

17   culpable than the average participant.  And I read, Your Honor,

18   from section 3B1.2, application note 3A.

19          Now, the only participants that we know of in this

20   offense are Mr. Beuschel and Mr. Fiore.  And again, leaving

21   aside some of the arguments Mr. Ambrosio has made whether it's

22   aberrant behavior or whether Mr. Fiore is a bad person and that

23   sort of thing which I will address those either now or when

24   Your Honor looks at the 3553(a) factors, but strictly looking

25   at the question of whether the defendant played a minor role in

```
 1    the offense, he clearly played a substantially more serious
 2    role in the offense than did Mr. Fiore.
 3          He is substantially more culpable in this offense than
 4    Mr. Fiore.  And the reason I say that, Your Honor, is that
 5    Mr. Beuschel is the one selling the drugs and Mr. Fiore is
 6    essentially the middleman who puts the deal together.
 7          That's the opposite of what Mr. Beuschel claimed when
 8    we interviewed him, but the emails show that it is the truth.
 9          Mr. Beuschel on May 7, 2014 emailed Mr. Fiore that he
10    had candy, skittles.  He told him the number of boxes, the
11    price.  He said, if more is needed, I'm sure we can accommodate
12    your request.  So he's selling to Mr. Fiore.
13          Mr. Beuschel says, send the funds tomorrow to our
14    account of record.  So he's the one collecting the money.  And
15    that's it.  Mr. Fiore has no other involvement other than to
16    set up a meeting between Mr. Beuschel and the cooperating
17    source, in other words, that Mr. Beuschel says he's coming
18    found, Mr. Fiore says, fine, meet directly with the cooperating
19    source, and he never does anything else.
20          Mr. Beuschel then meets the source, talks about the
21    terms of payment, makes his assurances about the quality of the
22    product, offers the cooperating source that he will set -- he
23    will put the cooperating source in touch with his,
24    Mr. Beuschel's, supplier for future deals himself.  He expects,
25    he said, a cut of those.  But he does all those directly with
```

1   the source.

2        Looking at the question did he play a minor role in

3   the offense, no, he clearly is the most culpable participant in

4   the offense and he's not entitled to that adjustment.

5        THE COURT:  All right.  With respect to the

6   defendant's objection to not receiving any reduction for role

7   in the offense, based on the testimony and evidence presented

8   at trial, and just so the record is clear when I said based on

9   the testimony and evidence presented, I am talking about the

10  testimony and evidence presented at trial, the Court will

11  overrule or deny the defendant's objection.  The Court finds by

12  a preponderance of the testimony and evidence presented at

13  trial that Mr. Beuschel was an active participant, a major

14  participant in this effort, and that he is not entitled to

15  either a minor or mitigating role adjustment.

16        All right.  Does that take care of all of the

17  defendant's objections, Mr. Ambrosio?

18        MR. AMBROSIO:  Yes, Your Honor.

19        THE COURT:  All right.  Thank you.

20        Madam Probation Officer, what does that do to the

21  guideline computation with the Court agreeing with the

22  government on the earlier objections.

23        THE PROBATION OFFICER:  The total offense level will

24  be 24.  The criminal history category is 1.  The guideline

25  range is 51 months to 63 months.  Supervised release is

1   unchanged at one year to three years.  And the fine range has

2   changed to $10,000 to $10 million.

3          THE COURT:  Thank you.

4          Mr. Beuschel, if you will step up to the podium.

5   Andrew Beuschel, you now being again before this Court and you

6   having been tried by a jury of 12 citizens of the United States

7   and the jury having found you as to Count~1 guilty and as to

8   Count~2 guilty of the offenses charged therein of the

9   indictment of the United States of America versus Andrew

10  Beuschel, case No. 15-60029-CR-Zloch for the United States

11  District Court for the Southern District of Florida and the

12  Court having previously adjudged you guilty of the offenses

13  charged in Counts 1 and 2 of that indictment, do you or does

14  anybody on your behalf now have any legal reason to show why

15  the sentence of the law should not now be pronounced upon you,

16  any legal reason?

17         THE DEFENDANT:  No.

18         THE COURT:  No legal reason having been shown as to

19  why sentence should not now be imposed, the Court will receive

20  whatever information or evidence may be offered in extenuation

21  or in mitigation of punishment or which is otherwise relevant

22  to the sentence to be imposed.

23         Mr. Beuschel, what would you like to say?

24         THE DEFENDANT:  Judge, first of all, I would like to

25  apologize to the Court for taking your time up in this matter.

1   Officer Osborne and Trimm, they have been very hospitable.

2   They were fair with me, so I do appreciate that.

3         I came to the Court based on meeting someone that was

4   not an up-front person.  If you look at my history and look at

5   how I have made my life and how I have developed my life, it's

6   somewhere -- you know, like I have always treated people fair

7   and I always felt that I should be treated fairly also.

8         I met people in Woodbridge in a facility that I

9   thought most of the people were friends of ours.  I did

10  business with them through disposal and through pallet

11  purchasing.  And we also did short dated items for liquidation

12  and for secondary sale which everybody had made a fortune in

13  moneys.

14        When the product was available, the Viagra was

15  available, you know, everybody had seen it that was dealing in

16  the facility itself.  The Viagra was there.  Like I said, I'm

17  not saying that I did not broker a deal with a friend of mine

18  at no value.  I did that.  I mean, I did that free and

19  willingly to help him out to get this product to him.

20        You know, I am not here to -- $2,000 does not affect

21  my life.  $3,000 does not affect my life.  You know, I make a

22  decent salary on an annual basis.  I make somewhere between

23  250, 300, thousand dollars a year.  These are not the dollars

24  and sense that are going to affect my life moving forward.

25  What I was trying to do is recoup my dollars that I had

 1   expended to Mr. Fiore and to Tony Bryant.  They were both

 2   coconspirators.  Those two people worked in conjunction with

 3   each other to steal money from other people.

 4        The only reason I went down to see Tony Bryant, the

 5   only reason, is that he had a cigar deal that was supposed to

 6   make amends for the $160,000 that they had stolen.  We lose

 7   track of the little things that were actually in place.  So for

 8   me to send a box down for $3,700, that's great.  Even if I told

 9   him I was going to send him $10,000 of a Viagra drug, $20,000

10   does not excuse he owes me $160,000.

11        That's what I was looking to recover.  He told me that

12   he was going to make it good.  He told me that these are the

13   things that these two gentlemen were going to take care of.  I

14   have letters from them.

15        From all these transactions that have gone on through

16   my emails, I don't know how many emails they went through, but

17   you know, a hundred thousand emails, somewhere around that, I

18   don't know exactly, ten years worth of my emails, in the

19   original conversation I had with Walter Jackovich, I spoke to

20   him about Viagra.  I used the word Viagra.  Originally when I

21   spoke to Frank, I used the word Viagra in August.  I used the

22   word Viagra.  He said, just call them blue and orange.

23        I'm not getting away.  I'm not saying I didn't use the

24   terminology that they were using, but this is not part of my

25   daily business.  I did not know that the product was

 1   counterfeit.  Do I know now?  Absolutely, 100 percent.

 2          Even when Walter and Rick were prosecuted for selling

 3   liquor and also these pills were found, nobody ever said when

 4   the Woodbridge Police Department came down to me, they never

 5   said that the product was counterfeit.  They said it was a

 6   salesman sample al.  They told me it was a salesman sample.  So

 7   I said, yes, this is something I gave to this person.

 8          And at that time, they could have said to me, Andy,

 9   listen, it's counterfeit, it's this.  If I knew at that

10   particular time in 2012 that it was counterfeit, then I would

11   have been tried with the other two gentlemen that got probation

12   and then I would have known at that particular time that it was

13   counterfeit, that it wasn't a real item.

14          We are in a situation now that the product was never

15   tested.  It was never known it was counterfeit.  So the story

16   that it was told to us that it was it distress brand, that it

17   was there for destruction is only thing that I ever knew.  So

18   when the agent said that it's a counterfeit product because it

19   was tested, that was the first time that I actually found out

20   it was counterfeit.

21          Now, we talk about the box, just for a quick

22   inference.  You talk about the box.  The reason I told Tony

23   Bryant to take it out of the box, if it had an expired date on

24   it, I didn't know that it had an expired date on it.  He tells

25   me it's expired.  In the court proceedings, you also had a date

```
 1    on the film, on the blister.  Why would I tell him to take it
 2    out of the box if the blister has a date on it?
 3         I mean, you know, this money that we are talking about
 4    is miniscule to my lifestyle.  I have a wife.  I have two
 5    children.  I conduct my business.  I'm a dietary supplement
 6    expert.  I manufacture product for major companies, Hydroxycut
 7    Slimquick.  I manufacture for Theramelt.  I am in business to
 8    make business.  I am not in business to jerk around with people
 9    like this.
10         THE COURT:  Why are you standing here this morning
11    then?
12         THE DEFENDANT:  I am standing here this morning
13    because I got caught up in something that was a counterfeit
14    product that I was unaware of until it was tested.  That is the
15    first time that I knew that this product was counterfeit.
16         If you look at all my emails, everything, everything I
17    do on a daily basis, on everything that you look at in my
18    portfolio, there is nothing that shows any kind reference to me
19    doing something illegally.
20         Did I get caught up in something?  100 percent.
21    Should I have pursued a different avenue for my $160,000?
22    100 percent.  But you know what, you got two people that don't
23    have a dime between them.  I had an attorney look at them.  I
24    couldn't put a lien on a car.  I couldn't put a lien on a
25    house.  I couldn't get them into court because they had no
```

1    assets, zero.  So my secondary alternative was only to badger

2    them and continually sitting on top of them to recover my

3    partner's and my money, the $160,000 that was owed to us.

4         Looking at it back now, it's stupid.  I lost $160,000,

5    I lost $40,000 in defense of this thing, and then whatever fine

6    or jail time that I am looking at for a $3,750 item.  That

7    means nothing to me, zero.

8         I am very sorry about what happened.  I am extremely

9    sorry.  And I don't know what more to say about what's going on

10   here.  I understand the facts that were presented.  I had

11   nobody -- if I went on the stand, you have nobody to -- you

12   can't collaborate or you can't ask Frank Fiore, you can't ask

13   Tony Bryant, the guys that owed me the money, to come down

14   here.  The people in Woodbridge, all the facts that were given

15   to Woodbridge that were saying that the product was taken and

16   seized, they had thought it was original salesman samples like

17   everybody else it.

18        Nobody ever told anybody that this stuff was bad until

19   the agents tested it in which I believe they tested the product

20   from Woodbridge and that's how they got the idea.  I was saying

21   from the beginning the product came from there.  It couldn't

22   have come from me to them.  It came from Woodbridge, and that's

23   why Frank had it down in Florida.

24        This is my business.  My business is, you know, a

25   legal piece of business.  I pay my taxes.  I record everything.

```
 1   Everything is accessible about Andy Beuschel.  If you look on
 2   my history, I'm going to be 52 this weekend, 52 years old, I
 3   have no problems in my life.  I had one issue with my son with
 4   emancipation about two or three years ago.  My ex-wife would
 5   not emancipate him so she brought me to court or I got arrested
 6   because they took my license from me which I didn't know.  They
 7   suspended my license.  So when I got picked up, I had to pay a
 8   $5,000 fee to get my emancipation resolved.  That's the only
 9   offense I have ever had in my life.
10            I am extremely sorry.  I am -- I went down to the
11   court in September with Tom because I was concerned, one, about
12   my wife and my children because I knew what kind of guy Frank
13   was.  You know, I'm not here to say that I didn't know what he
14   was and what he was about, I wasn't dealing with him on a daily
15   basis.  He's not my friend.  And in the inference that was
16   told, he basically says I'm rogue, I'm not his friend, I'm not
17   part of his crew.  I don't want to be part of his crew.  I
18   don't want to be part of his friends.
19            The long and short of it is that you have an
20   informant, Tony Bryant, and you have Frank Fiore who I don't
21   know what his convictions were, but you got two people who are
22   pointing the finger at me for a $3,700 deal.  It means nothing
23   to me.  I know it means something to the Court.
24            THE COURT:  I am going to need for you to begin to
25   wrap up.
```

1   THE DEFENDANT:  Okay.  I just like to let you know

2   that I think you have been very fair.  I thank you for your

3   time.  I'm sorry about everything that you have gone through to

4   have to listen to me, and I'm also sorry about what I have

5   brought to the Court.

6   THE COURT:  All right.  Thank you.

7   Mr. Ambrosio, what would you like to say?

8   MR. AMBROSIO:  Judge, I am going to be requesting a

9   variance based upon 3553(a) factors in this case.  I think the

10  Court has the ability to give great deference to Mr. Beuschel's

11  age and his prior background.

12  I submitted approximately 27 letters, I believe, of

13  support to Your Honor and those are all from family members.

14  And I know the Court often discounts them because everyone

15  expects family members to talk on behalf of their family

16  members, but Mr. Beuschel had letters of support from business

17  people throughout the country and throughout the world.

18  I just want the Court to be aware that there's a

19  Mr. Martinez in the court here today.  He wrote a letter to

20  Your Honor.  He came from Greece.  He's doing business with

21  Mr. Beuschel right now.  And he came in support because -- and

22  I think that says a lot, Your Honor, because someone like

23  Mr. Fiore, I don't think he's going to have those type of

24  letters of support when he was being sentenced.

25  And something that Your Honor also should be aware of

```
 1   is a disparate sentence.  I think a disparate sentence in this

 2   case is something that would allow Your Honor to create -- to

 3   grant a variance on behalf of Mr. Beuschel.  The guideline

 4   range for Mr. Beuschel at category 1, level 24 is 51 to 63

 5   months.

 6        I would point out, Your Honor, that Frank Fiore pled

 7   guilty, and I don't know what his criminal history was, but he

 8   received a 32-month sentence.  And there was an Anthony Carbone

 9   and a Gary Jones.  They each pled guilty and received 24-month

10   sentences.  And I implore Your Honor to consider the type of

11   conduct and the way that Fiore, Carbone, and Jones conducted

12   themselves.  They were involved in multiple crimes.  They were

13   talking about guns, counterfeit money, drugs, and actually

14   manufacturing counterfeit Xanax.

15        I think that if Your Honor contrasts Mr. Beuschel's

16   conduct in this case, that it truly is aberrant.  And I would

17   point out, Your Honor, that Your Honor can give him credit for

18   his conduct since his arrest.  He has been on pretrial release.

19   And I know from speaking to his pretrial officer in New Jersey

20   that he's been a model pretrial monitoree.  And there's been no

21   problems.  He's been doing business as usual, Your Honor.

22        And, Your Honor, one of the other things that I would

23   point out is I feel that Your Honor can give a variance in this

24   case based upon what I would consider an overvaluing of the

25   drugs.  I think that the 14-point enhancement is, it's heavily
```

```
 1   weighted.  And I don't think that it comports with the
 2   Sentencing Reform Act, Judge.  The purpose of the reform act,
 3   as you are well aware, is to punish and to help rehabilitate
 4   and to pay back victims.
 5          My position, Judge, is that putting Mr. Beuschel in
 6   jail is going to take away a tax paying individual from
 7   society.  His life has been an open book.  And as Your Honor is
 8   well aware, he's been going through a bankruptcy.  And that was
 9   a corporate bankruptcy.  It was related to his business.  His
10   life was like being in a fish bowl, his finances.  He had the
11   entire government looking at his finances and he's making --
12   here's a man that makes hundreds of thousands of dollars at a
13   clip sometimes and he is also a man that would risk money to
14   make money.
15          He's been in a little bit of financial straits lately,
16   but he is, from everyone I have ever spoken to in connection
17   with Mr. Beuschel, he's very well-liked.  He's a fighter and
18   he's somebody that is going to come back.  And I told
19   Mr. Beuschel, Your Honor, this does not define him.  He made a
20   monumental mistake by getting involved with people.  He should
21   have walked away.  He's had problems with his -- he embarrassed
22   his family.  He embarrassed his professional life.  And I think
23   that Your Honor can use that disparate sentence and give him a
24   much lower sentence.
25          Judge, I have suggested in my brief that this is
```

1   someone that Your Honor could give a split sentence or

2   probation to.  I don't think he's a threat to society.  He's

3   not a violent person, unlike Mr. Fiore who threatened to kill

4   Mr. Beuschel on tape.  And I don't think that -- he has to be

5   removed from that.  And I think that it would -- it just seems

6   incongruous that Mr. Beuschel would receive a sentence that was

7   greater than people that have criminal histories, are daily

8   involved in crime.

9           As I said, Judge, there are 30 letters from people all

10  over the country and all over the world that vouch for

11  Mr. Beuschel.  I believe that he was sincere in his apologies

12  to Your Honor.  And for those reasons, Judge, I would implore

13  Your Honor to consider a sentence that is well below the

14  guideline level here.

15          THE COURT:  All right.  Thank you.

16          What say the United States?

17          MR. OSBORNE:  Yes, Your Honor.  The guideline range

18  for imprisonment in this case is between 51 and 63 months.  The

19  government recommends a sentence at the midpoint of that range,

20  Your Honor, at a sentence of 57 months incarceration.  We also

21  recommend that Your Honor impose a $125,000 fine.

22          Now, let me talk about, since I am recommending a

23  sentence at the middle of the range reflecting both mitigating

24  and aggravating circumstances, let me address some of the

25  mitigating circumstances that Mr. Ambrosio brought up, Your

 1    Honor, and I will talk then about some of the aggravating

 2    circumstances as well.

 3            The most important, Your Honor, although Mr. Ambrosio

 4    has argued that this -- that this is an aberrant act by the

 5    defendant, it only would never have happened if he wasn't

 6    trying to collect this debt, but, in fact, the evidence is

 7    exactly the opposite of that, Your Honor, that it wasn't an

 8    aberrant act at all and that it was not brought about strictly

 9    by any effort to collect on the money that he was owed.

10            The reason I say that is it started back, the earliest

11    that we know of is November of 2012 in a deal that had nothing

12    to do with Mr. Fiore and the cooperating source.  Already in

13    November of 2012, Your Honor, the defendant is sending or was

14    sending texts to Mr. Jackovich or Jackovich, I don't know the

15    correct pronunciation of his name, in which he's using this

16    kind of coded language, blue and orange candies.  He's

17    obviously familiar with this type of transaction.  And he then

18    sends emails to Mr. Fiore in 2013 offering to sell him large

19    quantities of those same drugs.

20            So it's not something that he got wrapped up in in an

21    effort to collect a debt.  It's a business that he was in.  He

22    was in other businesses as well.  We agree with that.  But it's

23    by no means an aberrant act.  On the contrary, Your Honor, the

24    fact that it's a regular business that the defendant is

25    conducting is an aggravating factor.

1    It's not something where on one occasion he sold these

2    drugs and maybe that's the only time it ever happened.  In

3    fact, we know of three times, and his relevant conduct

4    encompasses just those three times, but a person who is in an

5    ongoing capacity selling these types of drugs over the course

6    of several years and these are the three incidents we happen to

7    know about, that is an aggravating factor that Your Honor

8    should take account of and it's one of the reasons that I don't

9    recommend a sentence at the low end of the guideline range.

10    Mr. Ambrosio also referred to a lot of letters that he

11    filed, essentially letters of character, Your Honor, people who

12    spoke to the defendant's character.  Those types of letters can

13    be mitigating factors in some circumstances, Your Honor, but in

14    this circumstance, I think there are also aggravating factors

15    regarding, again, Mr. Beuschel's character that Your Honor

16    should consider that at least kind of keep the scale equal.

17    And what I am referring to, Your Honor, is the fact

18    that Mr. Beuschel, attempting to collect this debt which we

19    agree is a real debt, it's discussed in Mr. Beuschel's recorded

20    conversation with the cooperating source, he really did believe

21    that the cooperating source and Mr. Fiore owed him around

22    $160,000.  Whether they really owed him the money, whose fault

23    it was, you know, Mr. Fiore, in his recording, he claimed it

24    was Mr. Beuschel's fault.  But that doesn't matter.

25    Mr. Beuschel believed he was owed this money.  And what he did

1    about it, Your Honor, is beat up Mr. Fiore.  What he told

2    Special Agent Trimm and I is that he slapped Mr. Fiore around

3    and that he said he made a very offensive comment to Mr. Fiore

4    about what Mr. Beuschel intended to do to Mr. Fiore's wife if

5    Mr. Fiore did not pay up this money, Your Honor.

6         And when he was speaking to the cooperating source on

7    the recorded conversation, it's true that he told the

8    cooperating source that was out of character that I did that to

9    Mr. Fiore, but the fact remains, Your Honor, that he did use

10   violence to try to collect that debt.

11        So when you think of that, I think it puts in a little

12   different light the comments that Your Honor saw that Mr. Fiore

13   made on the recording.

14        When Mr. Beuschel's name came up, Mr. Fiore blew up.

15   He said I want to kill that guy.  I want to put him in a

16   dumpster.  He started talking to the undercover officer, that

17   maybe the undercover officer should consider killing

18   Mr. Beuschel.  And I am not denying any of that.  I mean, I

19   prosecuted Mr. Fiore.  I am not apologizing for his comments.

20   But I am saying Mr. Fiore said those things, but Mr. Beuschel

21   actually did beat up Mr. Fiore to collect a business debt.

22        So again, you are not -- I am not suggesting you are

23   going to sentence Mr. Beuschel for that act.  That's not the

24   crime he's been charged with.  But I do think it should be

25   considered when you are looking at people who write letters to

 1  talk about Mr. Beuschel's character as an upstanding

 2  businessman that once he thought he was being owed money and he

 3  couldn't get his hands on it, a different side of him came out.

 4       THE COURT:  All right.  Thank you.  I have heard

 5  enough.

 6       MR. OSBORNE:  Thank you, Your Honor.

 7       Mr. Beuschel, if you will step up to the podium.  The

 8  Court being fully informed of the facts and circumstances

 9  surrounding the crimes and no legal reason having been shown as

10  to why sentence should not now be imposed, after consideration

11  of statements by all parties and a complete review of the

12  entire revised presentence report which contains the advisory

13  guideline computation and range which this Court has

14  considered, the Court has also considered all of the statutory

15  factors as set forth in 18 U.S.C. Section 3553(a), further it

16  is the finding of the Court that Mr. Beuschel is not able to

17  pay a fine.  Therefore, no fine shall be imposed.

18       Accordingly, pursuant to the Sentencing Reform Act of

19  1984, it is the judgment of the Court and the sentence of the

20  law that Andrew Beuschel is hereby committed to the custody of

21  the United States Bureau of Prisons to be imprisoned for a term

22  of 63 months.

23       This term consists of 63 months as to each of Counts 1

24  and 2 of the indictment to be served concurrently with each

25  other.

1        It is further ordered that Mr. Beuschel shall pay

2   restitution in the amount of $34,534.40.

3        During the period of incarceration, payments shall be

4   made as follows:

5        1.  If Mr. Beuschel earns wages in a federal prison

6   industry's job, that is a UNICOR job, he must pay 50 percent of

7   the wages earned toward the financial obligations imposed by

8   this judgment in a criminal case.

9        2.  If Mr. Beuschel does not work in a UNICOR job,

10  then he must pay a minimum of $25 per quarter toward the

11  financial obligations imposed in this order.

12       Upon release from imprisonment, Mr. Beuschel shall pay

13  restitution at the rate of ten percent of his monthly gross

14  earnings until such time as the Court may alter that payment

15  schedule in the interest of justice.

16       The United States Bureau of Prisons, the United States

17  Probation Office, and the United States Attorney's Office shall

18  monitor the payment of restitution and report to the Court any

19  material change in Mr. Beuschel's ability to pay.  These

20  payments do not preclude the government from using any other

21  anticipated or unexpected financial gains, assets, or income of

22  the defendant to satisfy the restitution obligations.

23       The restitution shall be made payable to the clerk,

24  United States Courts, and forwarded to the United States

25  Clerk's Office, attention financial section, 400 North Miami

1   Avenue, Room 8N09, Miami, Florida 33128.  The restitution will

2   then be forwarded by the clerk of the court to the victims in

3   this case.

4          Upon release from imprisonment, Mr. Beuschel shall be

5   on placed supervised release for a term of three years as to

6   each of Counts 1 and 2 to be served concurrently with each

7   other.  Within 72 hours of release from the custody of the

8   Bureau of Prisons, he shall report in person to the probation

9   office in the district to which he is released.

10          While on supervised release, he shall not commit any

11  crimes, he shall be prohibited from possessing a firearm or

12  other dangerous devices, he shall not possess a controlled

13  substance, he shall cooperate in the collection of DNA, he

14  shall comply with the standard conditions of supervised release

15  including the following special conditions:

16          1.  There shall be a financial disclosure requirement.

17          2.  There shall be a no new debt restriction, and

18          3.  There shall be a permissible search requirement,

19  all as noted more specifically in part G of the revised

20  presentence report.

21          It is further ordered that Mr. Beuschel shall pay

22  immediately to the United States a special assessment of $100

23  as to each of Counts 1 and 2 for a total of $200.

24          Does that cover everything, Madam Probation Officer?

25          THE PROBATION OFFICER:  Yes, Your Honor.

```
 1              THE COURT:  Except as otherwise modified here this

 2    morning, the Court adopts the advisory guideline computation,

 3    the total offense level, the criminal history category, the

 4    imprisonment range, the supervised release range, and the fine

 5    range as set forth in the revised PSR.  No fine has been

 6    imposed for the reasons previously stated.  Restitution has

 7    been ordered.  The sentence is within the advisory guideline

 8    range.  That range does not exceed 24 months.  And the Court

 9    finds no reason to depart or vary from the sentence called for

10    by the guidelines.

11              Obviously the Court has denied the defendant's request

12    for a variance.

13              Does the defense have any objections to any of the --

14    let me do this.  All of the defendant's objections are renewed

15    at this time and the Court's prior rulings remain the same.

16              The defendant's request for a variance is renewed at

17    this time and the Court has denied that request.

18              Does the defense have any objections or any additional

19    objections to any of the findings of facts or conclusions of

20    law made by the Court here today, Mr. Ambrosio?

21              MR. AMBROSIO:  No.

22              THE COURT:  Mr. Beuschel, do you have any?

23              THE DEFENDANT:  No.

24              THE COURT:  Any from the government?

25              MR. OSBORNE:  Your Honor, we just ask that Your Honor
```

```
 1   address the forfeiture issue, Your Honor, which at trial the
 2   parties agreed Your Honor could address it at sentencing.  We
 3   are asking for $3,387.50 money judgment.  That's in one of the
 4   addendums to the presentence report.  That's the amount of
 5   undercover funds that the cooperating source paid to
 6   Mr. Beuschel.  And Mr. Ambrosio told me before the hearing that
 7   he did not intend to contest that.
 8             THE COURT:  Is there any objection to that from the
 9   defense?
10             MR. AMBROSIO:  No, Your Honor.
11             THE COURT:  All right.  Then the government will
12   submit a proposed order within three days of this proceeding.
13             MR. OSBORNE:  Thank you, Your Honor.
14             THE COURT:  Any other objections from the government?
15             MR. OSBORNE:  No, Your Honor.
16             THE COURT:  Does the defense have any objection to the
17   manner or procedure in which sentence has been imposed or that
18   this hearing has been conducted?  Mr. Ambrosio?
19             MR. AMBROSIO:  No.
20             THE COURT:  Mr. Beuschel, do you have any?
21             THE DEFENDANT:  No.
22             THE COURT:  Any from the government?
23             MR. OSBORNE:  No, Your Honor.  Thank you.
24             THE COURT:  Mr. Beuschel, the Court now informs you,
25   sir, that you have 14 days from today within which to appeal
```

1   the conviction and sentence imposed.  Your failure to appeal

2   within the 14-day time period shall constitute a waiver of your

3   right to appeal.  If you are without funds with which to retain

4   a lawyer to assist you in any appeal, the Court would appoint a

5   lawyer for you upon a showing that you are indigent and unable

6   to afford a lawyer.

7           Is the defense requesting voluntary surrender?

8           MR. AMBROSIO:  Yes, Your Honor.  And we are also

9   requesting that he be allowed to be in a facility in New

10  Jersey.

11          THE COURT:  The Court recommends a federal facility in

12  New Jersey.  What does the government say about voluntary

13  surrender?

14          MR. OSBORNE:  We have no objection, Your Honor.

15          THE COURT:  All right.  The execution of sentence is

16  hereby deferred.  And, Mr. Beuschel, you are to surrender

17  yourself at the facility designated by the Bureau of Prisons no

18  later than noon on September 30, 2015.

19          All right.  There being no further business, this

20  session of the Court is adjourned.

21          Everyone have a great week.  Thank you, Counsel.

22          (Thereupon, the hearing concluded at 12:07 p.m.)

23                          – – –

24

25

C E R T I F I C A T E

      I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

10/23/15          s/ Tammy Nestor
                 Tammy Nestor, RMR
                 Official Court Reporter
                 299 East Broward Boulevard
                 Fort Lauderdale, Florida 33301
                 tammy_nestor@flsd.uscourts.gov

59

**$**

$10 [1]
$10 million [1]
$10,000 [2]
$100 [1]
$125,000 [1]
$130,000 [1]
$160,000 [7]
$2 [4]
$2,000 [1]
$20 [1]
$20,000 [1]
$200 [1]
$24 [1]
$25 [1]
$3,000 [1]
$3,387.50 [1]
$3,700 [2]
$3,750 [1]
$34,534.40 [2]
$40,000 [1]
$5,000 [2]
$50,000 [1]
$7,000 [1]

**'**

'13 [1]

**-**

-- but [1]

**0**

07071 [1]

**1**

10,000 [2]
10/23/15 [1]
100 percent [3]
104 [2]
10:36 [1]
12 [1]
12:07 [1]
130,000 [1]
14 [1]
14-day [1]
14-level [1]
14-point [4]
140 [2]
15 [1]
15-60029-CR-ZLOCH [1]
17 [2]
18 [3]
19 [1]
1984 [1]

**2**

2,724 [1]
20 [2]
2012 [10]
2013 [8]
2014 [8]
2015 [2]
24 [3]
24-month [1]
250 [2]
27 [1]
28 [1]
299 [2]
2A [1]
2B5.3 [1]

**3**

30 [3]

**300** [1]
32-month [1]
33128 [1]
33132 [1]
33301 [1]
33401 [1]
3553 [3]
3A [1]
3B1.2 [1]

**4**

40 [2]
400 [2]
45 [3]
46 [9]
47 [5]
48 [1]

**5**

50 percent [2]
500 [1]
5000 [1]
51 [4]
51 percent [2]
52 [2]
57 [1]
59 [1]

**6**

6,000 [1]
60 [1]
63 [5]

**7**

72 [1]
750 [1]

**8**

8N09 [1]

**9**

99 [1]

**A**

a.m [1]
aberrant [7]
aberration [2]
ability [3]
able [1]
about [49]
above [1]
above-entitled [1]
Absolutely [1]
abuse [1]
accept [4]
acceptance [7]
accepted [5]
accepts [2]
accessible [1]
accident [1]
accommodate [2]
Accordingly [1]
account [3]
accurate [1]
acknowledged [1]
act [7]
acted [1]
acting [1]
actions [4]
active [6]
actual [2]
actually [15]
addendum [2]
addendums [1]

**addiction** [1]
addictive [1]
additional [5]
address [6]
adjourned [1]
adjudged [1]
adjustment [11]
admission [1]
admit [4]
admits [2]
admitted [3]
adopts [3]
advisory [3]
affect [8]
afford [2]
after [3]
again [7]
age [1]
agent [5]
agents [1]
aggravating [5]
ago [1]
agree [5]
agreed [1]
agreeing [1]
agreement [1]
ahead [8]
AK47 [1]
al [1]
all [40]
allow [2]
allowed [1]
almost [3]
already [4]
also [27]
alter [1]
alternative [1]
although [2]
always [3]
am [27]
Ambrosio [27]
Ambrosio's [4]
amends [1]
AMERICA [2]
amount [7]
and/or [3]
ANDREW [7]
Andy [2]
annual [1]
another [3]
answer [1]
Anthony [1]
anticipated [1]
any [46]
anybody [5]
anyone [1]
anything [3]
AOL [1]
apologies [1]
apologize [1]
apologizing [1]
apparently [2]
appeal [4]
appearance [1]
appearances [2]
appeared [1]
appears [3]
applicable [5]
application [2]
apply [3]
appoint [1]
appreciate [1]
appropriate [1]
approximately [2]

## A

are [65]
argue [3]
argued [3]
arguing [2]
argument [9]
arguments [4]
around [5]
arrest [1]
arrested [3]
as [50]
aside [1]
ask [3]
asked [2]
asking [2]
assessment [1]
assets [2]
assist [1]
associated [1]
assurances [1]
attempting [2]
attention [1]
attorney [1]
Attorney's [6]
August [2]
Australian [1]
authentic [3]
available [2]
avenue [4]
average [2]
aware [6]
away [4]

## B

back [11]
background [2]
bad [3]
badger [1]
balance [2]
bankruptcy [2]
based [10]
basically [1]
basis [3]
be [60]
Beach [1]
beat [2]
became [1]
because [40]
been [30]
before [8]
began [1]
begin [1]
beginning [1]
behalf [7]
behavior [3]
being [9]
believe [14]
believed [2]
below [1]
between [6]
BEUSCHEL [102]
Beuschel's [20]
beyond [2]
big [1]
bit [2]
blew [1]
blister [4]
blue [10]
blues [2]
bodily [5]
book [1]
borrow [1]
both [5]

bought [3]
Boulevard [2]
bowl [1]
box [15]
boxes [2]
brand [1]
brief [2]
bring [4]
bringing [1]
broker [1]
Brook [1]
brought [5]
Broward [2]
Browne [1]
Bryant [7]
bumped [1]
burden [1]
Bureau [4]
business [26]
businesses [1]
businessman [4]
buy [7]
buyer [3]
buying [4]

## C

calculated [1]
call [4]
called [2]
Calling [1]
calls [2]
came [10]
can [20]
can't [6]
Canada [1]
candies [1]
candy [10]
capacity [1]
car [1]
Carbone [2]
care [5]
carry [1]
case [37]
cases [4]
category [3]
caught [4]
certain [1]
certainly [7]
certify [1]
change [1]
changed [1]
character [5]
characteristics [1]
charge [1]
charged [4]
charges [2]
cheap [1]
cheaper [1]
check [2]
children [2]
choose [1]
Christopher [1]
Cialis [10]
cigar [1]
circumstance [1]
circumstances [6]
citizens [1]
claimed [5]
clarification [1]
clarifications [2]
Clavine [8]
clear [4]
clearly [4]
clerk [2]

Clerk's [1]
client [1]
client's [1]
clients [1]
clip [1]
co [3]
co-conspirator [3]
coconspirators [2]
coded [6]
coffee [1]
collaborate [1]
collect [7]
collecting [1]
collection [1]
colloquy [1]
color [1]
combines [1]
come [4]
coming [2]
comment [1]
commented [1]
comments [2]
commit [1]
committed [2]
committing [3]
commonly [1]
companies [1]
compare [1]
competing [1]
complained [2]
complete [1]
comply [1]
comports [1]
computation [8]
computations [2]
concerned [1]
concluded [2]
conclusions [1]
concurrently [2]
conditions [4]
conduct [12]
conducted [2]
conducting [2]
confer [2]
confessed [1]
confidential [3]
confusion [1]
conjunction [1]
connection [1]
conscious [1]
consider [6]
consideration [1]
considered [5]
consistent [1]
consists [1]
conspirator [3]
constitute [1]
constitutional [2]
contained [2]
contains [1]
contest [2]
context [3]
continually [1]
contrary [1]
contrast [5]
contrasts [1]
controlled [2]
conversation [4]
convict [1]
conviction [1]
convictions [1]
cooperate [1]
cooperating [23]
copying [1]

corporate [1]
correct [13]
correction [1]
correctly [1]
corroborating [3]
corroboration [1]
cost [1]
could [12]
couldn't [5]
Counsel [5]
Count [2]
counted [1]
counterfeit [62]
counterfeited [1]
country [2]
Counts [4]
Counts 1 [4]
course [3]
court [52]
Court's [3]
courtroom [1]
Courts [1]
cover [1]
CR [2]
crazy [2]
create [2]
created [1]
creating [2]
credit [2]
crew [2]
crime [10]
crimes [3]
criminal [6]
CRR [1]
culpability [1]
culpable [3]
custody [2]
customer [1]
cut [1]

**D**

daily [4]
dangerous [2]
dangers [1]
date [16]
dated [1]
dates [1]
day [2]
days [2]
deal [16]
dealing [7]
deals [1]
death [6]
debt [10]
December [3]
December 2012 [1]
decent [1]
defendant [14]
defendant's [12]
defendants [1]
defense [15]
defense's [1]
deference [2]
deferred [1]
define [1]
definition [2]
defraud [1]
deleted [1]
demonstrably [1]
denied [4]
deny [2]
denying [1]

depart [1]
Department [5]
designated [1]
designed [1]
destroy [1]
destruction [1]
determination [2]
determine [1]
determined [1]
developed [1]
devices [1]
did [34]
didn't [18]
dietary [1]
difference [3]
differences [1]
different [10]
dime [1]
diminished [1]
directed [1]
direction [1]
directly [2]
disclosure [1]
discounts [1]
discourse [1]
discretion [2]
discussed [4]
disparate [3]
disposal [1]
dispute [4]
distance [1]
distress [1]
distribution [2]
district [6]
DNA [1]
do [26]
docket [2]
does [33]
doesn't [3]
dog [2]
doing [4]
dollars [4]
Dominican [2]
don't [30]
done [2]
doubt [2]
down [11]
driven [1]
drug [10]
drugs [73]
dumpster [1]
during [3]
dysfunction [1]

**E**

each [8]
earlier [2]
earliest [1]
early [1]
earned [1]
earnings [1]
earns [1]
easily [2]
East [3]
easy [1]
effect [2]
effort [4]
either [4]
element [3]
elements [1]
else [2]
email [5]
emailed [3]
emails [21]

emancipate [1]
emancipation [2]
embarrassed [1]
embossed [1]
emphasize [1]
encompasses [1]
end [2]
enhancement [4]
enough [3]
entire [2]
entirety [2]
entitled [4]
entry [2]
equal [1]
equivalent [4]
erectile [1]
Esquire [3]
essentially [5]
establish [4]
established [1]
establishes [2]
evade [1]
even [8]
event [1]
events [1]
ever [9]
everybody [3]
everyone [3]
everything [9]
evidence [28]
ex [1]
ex-wife [1]
exact [3]
exactly [4]
examined [2]
example [1]
exceed [1]
exceeded [1]
except [3]
excuse [3]
execution [1]
exercising [2]
Exhibit [1]
exhibits [1]
expects [2]
expended [1]
experienced [1]
expert [2]
expiration [13]
expired [14]
extenuation [1]
extreme [1]
extremely [2]

**F**

facility [6]
fact [20]
factor [2]
factors [5]
facts [4]
factual [2]
failure [1]
fair [3]
fairly [1]
fake [2]
familiar [1]
family [4]
fantasy [1]
fault [2]
February [7]
February 2013 [2]
federal [3]
fee [1]
feel [2]

felt [1]
fighter [1]
figure [1]
figures [1]
filed [6]
film [1]
final [2]
finances [2]
financial [6]
find [2]
finding [5]
findings [1]
finds [6]
fine [8]
finger [1]
Fiore [50]
Fiore's [6]
firearm [1]
first [14]
fish [1]
five [1]
flip [1]
FLORIDA [9]
flsd.uscourts.gov [2]
follow [2]
follow-up [1]
following [2]
follows [1]
font [1]
foregoing [1]
forfeiture [1]
forgotten [1]
Fort [3]
forth [3]
forthcoming [1]
fortune [1]
forward [1]
forwarded [2]
found [9]
four [4]
four-level [1]
Fourth [1]
Frank [13]
free [1]
freely [1]
friend [5]
friends [2]
front [1]
fully [7]
funds [3]
further [4]
future [1]

## G

gains [1]
Gary [1]
gave [5]
gentlemen [2]
get [16]
getting [3]
gigabytes [1]
give [6]
given [4]
go [10]
goes [1]
going [23]
gone [2]
good [14]
goods [2]
got [14]
government [25]
government's [9]

grant [1]
great [5]
greater [1]
Greece [1]
gross [1]
guess [3]
guideline [21]
guidelines [4]
guilty [6]
guns [1]
guy [3]
guys [1]

## H

habit [1]
had [42]
half [1]
hand [1]
hands [1]
happen [1]
happened [3]
hard [5]
has [47]
hasn't [1]
have [70]
having [5]
he [236]
he's [42]
health [1]
hear [4]
heard [2]
hearing [4]
heavier [1]
heavily [1]
help [1]
helped [1]
helping [1]
helps [1]
her [1]
herbal [1]
here [25]
here's [2]
hereby [3]
hide [1]
Hill [4]
him [33]
himself [5]
his [53]
histories [1]
history [5]
holder [1]
Honor [159]
HONORABLE [1]
hoping [1]
hospitable [1]
hours [1]
house [1]
how [6]
However [1]
huge [1]
hundred [1]
hundreds [1]
Hydroxycut [1]

## I

I'll [2]
I'm [16]
idea [2]
identical [2]
illegal [2]
illegally [1]
immediately [1]
implore [2]
importance [1]

important [1]
importation [1]
impose [1]
imposed [9]
imprisoned [1]
imprisonment [4]
incarceration [2]
incident [2]
incidents [2]
include [1]
included [3]
includes [1]
including [1]
income [1]
incongruous [1]
incorrect [1]
increase [6]
increased [1]
inculpating [2]
indicate [1]
indicated [1]
indication [2]
indictment [7]
indigent [1]
individual [2]
industry's [1]
inference [2]
informant [1]
information [1]
informed [4]
informs [1]
infringe [2]
infringed [9]
infringement [8]
infringes [1]
infringing [3]
ingredient [5]
initially [1]
injury [7]
insisted [1]
instance [2]
instructed [1]
intellectual [1]
intend [1]
intended [2]
intending [1]
intent [2]
interest [1]
interpretation [3]
interstate [2]
interview [1]
interviewed [1]
introduce [1]
introduced [2]
involved [8]
involvement [3]
involving [5]
is [199]
isn't [1]
issue [6]
it [127]
it's [47]
item [14]
items [2]
its [5]
itself [2]

## J

Jackovich [11]
Jackovich's [1]
Jacovich's [1]
jail [2]
January [7]
jerk [1]

Jersey [8]
job [4]
Jones [2]
JUDGE [25]
judgment [3]
judicial [1]
July [1]
July 17 [1]
June [1]
June 17 [1]
jury [9]
jury's [2]
just [35]
justice [1]

**K**

keep [1]
kill [2]
killing [2]
kind [7]
knew [14]
know [50]
knowing [1]
knowingly [3]
knowledge [1]
known [3]
knows [2]

**L**

lack [2]
language [14]
large [1]
last [2]
lately [1]
later [5]
Lauderdale [3]
laughing [1]
law [3]
lawyer [4]
lawyer's [1]
lead [1]
least [5]
leaves [1]
leaving [1]
left [1]
legal [5]
legitimate [5]
less [2]
let [10]
letter [1]
letters [11]
level [9]
levels [2]
license [3]
lien [2]
life [12]
lifestyle [1]
light [1]
like [15]
liked [1]
liquidation [1]
liquor [1]
listed [1]
listen [2]
little [8]
long [1]
look [20]
looking [11]
looks [5]
lose [1]
loss [1]
lost [2]

lot [1]
low [3]
lower [1]
Lyndhurst [1]

**M**

Madam [3]
made [19]
magnitude [1]
major [2]
majority [1]
make [13]
makes [6]
making [3]
man [3]
manner [1]
manufacture [3]
manufactured [1]
manufacturers [1]
manufacturing [1]
many [2]
Marc [2]
mark [1]
marketing [1]
Martinez [1]
material [1]
matter [3]
matters [1]
Max [1]
may [7]
May 7 [2]
maybe [3]
me [35]
mean [4]
means [4]
meant [2]
meet [1]
meeting [3]
meetings [1]
meets [2]
members [3]
memo [1]
memorial [1]
mentioned [1]
message [1]
messages [2]
met [7]
Miami [3]
middle [1]
middleman [4]
midpoint [1]
might [1]
million [1]
mimic [1]
mind [1]
mine [1]
minimized [1]
minimizing [1]
minimum [1]
miniscule [1]
minor [14]
minute [2]
miss [1]
mistake [1]
mistaken [1]
misunderstanding [1]
mitigating [5]
mitigation [1]
model [1]
modified [1]
Monday [1]
money [15]
moneys [1]
monitor [1]

month [2]
monthly [1]
months [12]
monumental [1]
more [9]
morning [10]
most [5]
motions [2]
mouth [1]
moving [1]
Mr [7]
Mr. [201]
Mr. Ambrosio [25]
Mr. Ambrosio's [4]
Mr. Beuschel [91]
Mr. Beuschel's [20]
Mr. Bryant [1]
Mr. Fiore [37]
Mr. Fiore's [5]
Mr. Jackovich [9]
Mr. Jackovich's [1]
Mr. Jacovich's [1]
Mr. Martinez [1]
Mr. Trimm [1]
Mr. Veltre [5]
Mr.Fiore [2]
Ms. [3]
Ms. Hill [3]
much [4]
multiple [1]
multiplied [1]
must [4]
my [59]
myself [1]

**N**

name [4]
named [1]
namely [1]
need [8]
needed [1]
nestor [5]
never [6]
new [9]
next [1]
no [43]
No. [7]
No. 15-60029-CR-Zloch [1]
No. 15-60029-Criminal [1]
No. 20 [1]
No. 45 [3]
No. 46 [1]
nobody [5]
nondrug [1]
noon [1]
North [2]
not [87]
note [5]
noted [2]
notes [1]
nothing [7]
November [9]
November 2012 [3]
November 28 [1]
now [28]
number [2]
numbering [1]
numbers [2]

**O**

objected [2]
objection [27]
objections [19]

obligations [3]
observer [1]
obtains [1]
obviously [5]
occasion [1]
off [3]
offense [18]
offenses [2]
offensive [1]
offered [1]
offering [2]
offers [1]
office [11]
officer [8]
Official [2]
often [2]
oh [2]
okay [5]
old [3]
once [2]
one [30]
one-time [1]
ones [3]
ongoing [1]
only [17]
open [1]
opinion [1]
opposed [1]
opposite [2]
orange [10]
oranges [2]
order [4]
ordered [3]
original [4]
Originally [1]
Osborne [3]
other [30]
otherwise [2]
our [2]
ours [1]
out [24]
over [5]
overall [1]
overdose [2]
overrule [4]
overvaluing [1]
overwhelming [1]
owed [9]
owes [1]
own [3]
owners [1]

**P**

p.m [1]
pack [3]
package [2]
packaging [2]
packets [1]
packs [1]
paid [2]
pallet [1]
Palm [1]
pamphlets [1]
papers [2]
paragraph [19]
paragraphs [2]
part [6]
participant [7]
participants [1]
particular [5]
parties [2]
partner [1]

partner's [1]
pass [2]
passed [2]
pay [13]
payable [1]
paying [1]
payment [4]
payments [2]
penalize [1]
penalized [1]
people [26]
per [4]
percent [8]
Percocet [2]
period [2]
periods [1]
permissible [1]
person [15]
personal [1]
Pfizer [1]
phony [1]
picked [1]
piece [1]
pill [1]
pills [6]
place [1]
placed [1]
Plaintiff [2]
plane [1]
play [1]
played [2]
plays [1]
Please [1]
pled [2]
podium [2]
point [19]
pointed [4]
pointing [1]
points [1]
police [9]
portfolio [1]
pose [2]
posed [1]
position [14]
possess [1]
possessing [1]
possession [1]
possibility [1]
potency [1]
potent [1]
preclude [1]
preponderance [14]
prescription [4]
present [2]
presented [8]
presentence [14]
presumably [1]
pretrial [3]
pretty [3]
previously [2]
price [1]
prints [1]
prior [2]
prison [1]
Prisons [4]
privately [1]
probably [2]
probation [10]
problem [1]
problems [3]
procedure [1]
proceeding [1]
proceedings [3]
producing [1]

product [30]
products [1]
professional [1]
proffer [1]
prohibited [1]
prohibits [1]
prong [2]
pronounced [1]
pronunciation [1]
proof [2]
proper [2]
properly [1]
property [1]
proposed [1]
prosecuted [2]
prosecutor [1]
prove [1]
proved [1]
PSR [5]
public [1]
pulled [1]
punish [1]
punished [1]
punishment [1]
purchaser [2]
purchasing [2]
purpose [3]
purposes [4]
pursuant [1]
pursued [1]
pushes [1]
put [10]
puts [2]
putting [1]

**Q**

quality [1]
quantities [1]
quarter [1]
question [7]
quick [1]
quite [3]

**R**

raised [1]
range [13]
rate [1]
rather [1]
read [3]
reading [1]
real [11]
really [5]
reason [13]
reasonable [2]
reasonably [3]
reasons [9]
Rebecca [1]
receive [2]
received [2]
receiving [2]
reckless [1]
recommend [2]
recommending [1]
recommends [2]
record [7]
recorded [2]
recording [2]
recoup [1]
recover [1]
recreational [1]
reduction [7]
refer [1]
reference [1]
referred [1]

referring [1]
refers [2]
reflect [2]
reflecting [1]
reform [3]
refused [1]
regard [2]
regarding [4]
regular [2]
regulated [1]
regulations [1]
rehabilitate [1]
related [2]
release [9]
released [1]
relevant [6]
remain [1]
remaining [1]
remains [2]
remember [2]
remembers [1]
remind [2]
removed [2]
render [1]
renewed [2]
renumbered [1]
report [16]
REPORTED [1]
Reporter [2]
representations [1]
representative [1]
Republic [2]
request [7]
requesting [3]
require [2]
requirement [2]
resold [1]
resolved [3]
respect [2]
respond [1]
responded [1]
responsibility [16]
restitution [10]
restless [1]
restriction [1]
result [1]
retail [4]
retain [1]
retained [1]
review [2]
reviewed [1]
revised [11]
Rick [1]
right [28]
risk [12]
RMR [2]
rogue [1]
role [15]
Room [1]
ruling [1]
rulings [1]

**S**

said [35]
salable [1]
salary [1]
sale [1]
salesman [3]
same [19]
sample [2]
samples [1]
satisfy [1]

saw [1]
say [18]
saying [18]
says [21]
scale [1]
scenario [1]
schedule [1]
search [2]
seated [1]
second [2]
secondary [2]
section [5]
see [11]
seems [1]
seen [1]
sees [1]
seized [2]
self [1]
self-serving [1]
sell [5]
selling [12]
send [5]
sending [2]
sends [1]
sense [4]
sent [2]
sentence [24]
sentenced [1]
sentences [1]
sentencing [7]
separated [1]
September [3]
serious [6]
served [2]
serving [1]
session [1]
set [8]
several [2]
shall [18]
she [2]
ship [2]
shipment [2]
shipments [1]
shipped [9]
shipping [1]
short [3]
should [25]
shouldn't [2]
show [3]
showed [2]
showing [1]
shown [2]
shows [2]
sic [1]
side [1]
similar [2]
simply [1]
since [3]
sincere [1]
sir [4]
sitting [2]
situation [1]
size [1]
skittles [9]
slapped [1]
Slimquick [1]
small [1]
sniffing [2]
so [53]
society [2]
sold [6]
some [14]
somebody [2]
someone [4]

something [13]
sometimes [1]
somewhere [3]
son [1]
sorry [5]
sort [6]
source [28]
South [1]
SOUTHERN [2]
speak [2]
speaking [4]
special [4]
specific [2]
specifically [7]
spent [2]
split [1]
spoke [6]
spoken [1]
stand [2]
standard [4]
standing [2]
standpoint [1]
stark [1]
start [1]
started [3]
stated [4]
statement [3]
statements [5]
STATES [17]
statute [2]
statutory [2]
steal [1]
step [2]
still [3]
stolen [1]
story [8]
straits [1]
Street [1]
strictly [2]
stuff [9]
stupid [1]
submission [1]
submissions [1]
submit [12]
submitted [2]
substance [4]
substantially [7]
subtle [3]
such [2]
sufficient [1]
sufficiently [1]
suggest [5]
suggested [3]
suggesting [2]
suggests [1]
Suite [1]
summarize [1]
supervised [5]
supplement [1]
supplemental [1]
supplier [1]
support [4]
supposed [2]
sure [4]
surrender [3]
surrounding [1]
suspended [1]
sustain [1]
system [1]

**T**

tablet [1]
tablets [4]
take [21]

taken [2]
taking [4]
talk [6]
talked [2]
talking [8]
talks [7]
tammy [5]
tape [1]
tax [1]
taxes [1]
tell [3]
tellingly [1]
tells [1]
ten [2]
term [3]
terminology [1]
terms [3]
tested [6]
testified [1]
testimony [11]
text [3]
texts [1]
than [14]
thank [16]
that [467]
that's [32]
their [5]
them [33]
themselves [2]
then [23]
TheramelT [1]
there [60]
there's [8]
therefore [6]
therein [1]
Thereupon [2]
these [22]
they [58]
thing [8]
things [8]
think [46]
third [4]
this [89]
Thomas [2]
those [34]
though [1]
thought [4]
thousand [3]
thousands [1]
threat [1]
threatened [1]
three [8]
through [7]
throughout [2]
time [29]
times [4]
titled [1]
today [8]
together [11]
told [22]
Tom [1]
tomorrow [1]
Tony [6]
too [4]
took [1]
top [1]
total [6]
totality [1]
touch [2]
toward [2]
towards [1]
toxic [1]

track [1]
traffic [2]
trafficked [4]
trafficking [5]
transaction [5]
transactions [1]
transcription [1]
transfer [1]
treated [2]
trial [22]
tried [2]
Trimm [4]
true [9]
truly [1]
truth [1]
try [1]
trying [11]
Turning [1]
two [22]
two-point [1]
type [4]
types [2]
typos [1]

## U

U.S [4]
U.S.C [1]
unable [1]
unaware [1]
unchanged [1]
under [2]
undercover [4]
understand [4]
understood [2]
unexpected [1]
unexpired [3]
unfortunately [1]
UNICOR [2]
unindicted [1]
UNITED [17]
unless [1]
unlike [1]
until [4]
unwitting [1]
up [22]
up-front [1]
updated [2]
upheld [1]
upon [8]
UPS [1]
upstanding [1]
us [7]
use [9]
used [10]
using [7]
usual [1]
utilize [1]

## V

Valley [1]
value [22]
variance [6]
various [2]
vary [1]
Veltre [5]
version [3]
versus [1]
very [14]
via [1]
Viagra [48]
victims [2]
video [1]
videotape [2]
view [1]

violence [1]
violent [1]
virtually [1]
voluntary [4]
vouch [1]

## W

wages [2]
wait [1]
waiver [1]
walked [1]
Walter [2]
want [14]
wanted [5]
wants [3]
warehouse [2]
warrant [1]
was [164]
wasn't [10]
way [3]
we [35]
week [1]
weekend [1]
weight [1]
weighted [1]
well [19]
well-liked [1]
went [9]
were [50]
weren't [1]
West [1]
what [61]
what's [3]
whatever [3]
when [35]
where [12]
whereas [1]
whether [7]
which [34]
While [1]
who [18]
whole [2]
wholesale [3]
whose [1]
why [9]
widely [1]
wife [5]
will [26]
WILLIAM [1]
willingly [1]
withal [1]
within [5]
without [5]
won't [1]
Woodbridge [12]
word [4]
words [5]
work [1]
worked [1]
world [2]
worried [1]
worth [2]
would [50]
wouldn't [3]
wrap [1]
wrapped [1]
write [1]
writing [2]
written [2]
wrong [5]
wrote [1]

## X

Xanax [2]

yeah [2]
year [3]
years [8]
yes [22]
yet [2]
you [135]
your [173]
yourself [1]

**Z**

zero [9]
ZLOCH [3]